THE FOLLOWING ORDER
IS APPROVED AND ENTERED
AS THE ORDER OF THIS COURT:

DATED: August 14, 2009



_____
Honorable Pamela Pepper
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

IN RE:     ANTHONY P. HANLEY,                Case No. 09-21220-pp

           Debtor.                           Chapter 13

_____

**ORDER OVERRULING IN PART THE DEBTOR'S OBJECTION TO CREDITOR
DFL, INC.'S MOTION DISMISS CASE, AND CONFIRMING EVIDENTIARY
HEARING AS TO THE REMAINING ISSUES**
_____

Creditor DFL, Inc., holder of a third mortgage on the debtor's residence, has moved to dismiss the debtor's Chapter 13 case, alleging that the debtor exceeds the Chapter 13 debt limits prescribed by 11 U.S.C. § 109(e). The debtor has objected. For the reasons that follow, the Court overrules that part of the debtor's objection to DFL, Inc.'s motion to dismiss in which the debtor argues that his debt to DFL is "unliquidated," and confirms the August 26, 2009, 1:30 p.m. evidentiary hearing to resolve the question of the amount of the debtor's unsecured debt.

1

I.  FACTUAL BACKGROUND

The debtor filed his original schedules on February 19, 2009. At that time, his Summary of Schedules reflected the total amount of debt held by secured creditors as $1,226,918.33, and the total debt held by unsecured creditors as $69,940.65 (including priority debt). His Schedule A listed the value of his residence as $365,000. His Schedule D showed that of the $1,226,918.33 total debt held by secured creditors, $264,088.63 of that was unsecured, leaving the total amount of secured debt at $962,829.70, and increasing the amount of unsecured debt to $334,029.28.

On July 7, 2009, the debtor filed amended schedules. His amended Summary of Schedules listed the amount of debt held by secured creditors as $1,239,824.15, showed no unsecured priority debt, and reflected unsecured non-priority debt of $53,785.47. The amended Schedule A still valued his residence–the collateral which secures the largest secured debts–at $365,000.

On June 22, 2009, creditor DFL, Inc., which holds the third mortgage on the debtor's residence, filed a motion to dismiss the debtor's case. DFL alleged that the debtor's own schedules showed "noncontingent, liquidated, secured debts of $1,227,119.78."[1] DFL argued that that amount exceeded the Chapter 13 secured debt limit of $1,010,650. DFL also argued that the debtor actually

_____

[1] In support of this allegation, DFL cited to "Schedule D filed December 19, 2008." The debtor did not file his bankruptcy petition until February 4, 2009. He filed his first Schedule D on February 19, 2009, and that Schedule D reflected a total of $1,226,918.33.

2

had more than $1,227,119.78 in secured debt, pointing to a motion for relief from stay that the holder of the first mortgage had filed in which it valued its debt higher than did the debtor. Finally, DFL noted that the debtor had filed motions to avoid certain liens, and that if he was successful in doing so, this would decrease his *secured* debt total, but would increase the total of his *unsecured* debt to such an extent that he would exceed the *unsecured* debt limit for Chapter 13.

The debtor objected to DFL's motion, raising a variety of defenses. He argued that the Court should include only the fully-secured portions of the claims held by secured creditors in the secured debt calculations. He argued that certain of his debts were "contingent," and that certain others were not "liquidated." He argued that yet another of the debts was not his, but was attributable to his non-filing spouse.

The Court held two hearings, at which the parties argued their positions. The Court then took the matter under advisement.

II.   <u>ANALYSIS</u>

Section 109 of the Bankruptcy Code explains who is, and is not, eligible to be a debtor. Section 109(e) states that:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $336,900 and noncontingent, liquidated, secured debts of less than $1,010,650 . . . may be a debtor under Chapter 13 of this title.

    A.    *<u>The debtor does not exceed the secured debt limit set by 11 U.S.C. §</u>*

3

### *109(e).*

1. In order to calculate the amount of secured and unsecured debt for the purposes of § 109(e), the Court must bifurcate the debt held by secured creditors into secured and unsecured portions.

DFL began its motion to dismiss by arguing that the total amount of debt the debtor showed on his schedules as being held by the secured creditors exceeded the § 109(e) debt limit. It is true that the debtor's original Schedule D showed a total of $1,226,918.33 held by secured creditors, and that his amended Schedule D showed a total of $1,239,824.15 held by secured creditors. It is also true that both of these amounts exceed the $1,010,650 limit prescribed by § 109(e). DFL's argument, however, ignores the applicable case law, which mandates that the Court include in the secured debt calculation only the fully-secured portions of those totals.

Twenty-five years ago, the Seventh Circuit held in Matter of Day that courts are use a § 506(a) analysis to bifurcate debts into their secured and unsecured portions when calculating Chapter 13 debt limits. Matter of Day, 747 F.2d 405, 406-407 (7th Cir. 1984). Thus, this Court must conduct a § 506(a) analysis on the debts the debtor listed as being held by the secured creditors.

4

2.      Next, one must determine the correct value of the debts the
        Court must bifurcate, and the Court concludes that the
        debtor's values are the more appropriate values to use.

        a.      *If one uses the values and classifications the debtor
                used in his schedules, one finds that the debtor does not
                exceed the secured debt limit.*

We start by looking at how the debtor himself bifurcated the debts.  The

debtor's amended Schedule D shows the following creditors with claims against

the following collateral:

Residence:
Chase (1st mortgage.)            $291,245.60 (secured)
Summit (2nd mortgage)           $121,547.02 ($47,792.62 unsecured)
DFL (3rd mortgage)              $195,088.63 (*unsecured*)
Van Horn (4th mortgage)         $25,000 (*unsecured*)

Boat and Trailer:
First Midwest Bank              $3,501.15 (secured)

Newhall Rental Property:
M&I Bank (1st mortgage)         $181,095.97 (secured)
Peoples Bank (2d mortgage)      $84,486.17 (secured)
Van Horn (3rd mortgage)         $100,000 (secured)

Lake Geneva Property:
Peoples Bank (1st mortgage)     $133,241.16 (secured)
Van Horn (2d mortgage)          $75,000 ($1,000 unsecured)

Tahoe, Volvo, Motor Home:
Peoples Bank                    $24,618.45 (secured)

If one adds up the total amount of debt which the debtor classified as

"secured" on the amended Schedule D, one discovers that it comes to

$965,942.90–less than the secured debt limit of § 109(e).  If one adds up the

total amount of debt which the debtor classified as "unsecured" on the

5

amended Schedule D, it comes to $268,881.25.

        b.    *Case law provides that the Court may look beyond the debtor's values and classifications to determine whether the debtor exceeds the § 109(e) debt limit.*

Thus, using the debtor's own schedules and the debtor's own classifications, it is clear that the debtor's *secured* debt does not exceed the § 109(e) secured debt limit. DFL, however, asserts that the Court should look beyond the debtor's schedules to determine the amounts of his secured and unsecured debts, and argues that if the Court looks beyond the schedules, it will discover that the debtor does, in fact, exceed the secured debt limit.

As to DFL's assertion that the Court can look beyond the debtor's schedules in calculating the debt limits, there is case law supporting that assertion. In <u>In re McGovern</u>, 122 B.R. 712, 714 (Bankr. N.D. Ind. 1989), the Court explained:

> A debtor's eligibility for relief under Chapter 13 is not determined solely by reference to the debts and claims as he has chosen to schedule them. Congress did not intend that debtors would be given exclusive control over the accessibility to Chapter 13 or be permitted to circumvent its debt ceilings by the artful manipulation fo the information contained in the bankruptcy filings. *See Matter of Day*, 747 F.2d 405 (7th Cir. 1984); *In re Albano*, 55 B.R. 363, 368 (D.N.D. Ill. 1985). Even where the Chapter 13 statement is filed in good faith, it is not dispositive on the question of eligibility. Rather, it is only the point of beginning. *In re Edwards*, 51 B.R. 790, 791 (Bankr. D.N.M. 1985). Thus, just because a creditor has been scheduled in one fashion or another does not necessarily make it so.

So, the law does not prohibit this Court from considering sources outside the schedules when looking at the debtor's Chapter 13 eligibility. Accordingly,

6

the Court next calculates the secured debt using DFL the values and classifications argued by DFL.

>    c.    *If one uses the values and classifications argued by DFL, one still concludes that the debtor does not exceed the secured debt limit.*

DFL disagrees with the debtor on the amount of two (2) of the secured debts. With regard to the first mortgage that creditor Chase holds on the debtor's residence, DFL argues that the amount of that debt is $311,953.90–the amount Chase recited in the motion for relief from stay it filed on May 20, 2009–and not the $291,245.60 the debtor lists on the amended Schedule D. DFL, therefore, asserts that Chase holds $20,708.30 more in secured debt than the debtor claims. Not surprisingly, DFL also disputes the debtor's account of the amount of its own debt on the third mortgage it holds on that same residence. While the debtor lists its debt to DFL as $195,088.63, DFL argues–based on its proof of claim–that the debtor owes it $233,446.64.

If the Court uses DFL's numbers, rather than the debtor's, what effect does that have on the secured debt limits discussion? None at all. The debtor shows $965,942.90 of secured debt, using the amount he claims to owe Chase. If, rather than using the debtor's number, one uses the value that DFL assigns to the Chase debt, and assumes that every dollar of that amount is fully secured, one adds $20,708.30 of secured debt to the debtor's total. That mathematical exercise increases the debtor's secured debt from $965,942.90 to $986,651.20–still well below the $1,010,650.00 debt limit set in § 109(e).

Case 09-21220-pp    Doc 78    Filed 08/14/09    Page 7 of 32

Because the debtor does not exceed the secured debt limits regardless of whether the Court accepts his valuation of the Chase debt or DFL's, it is not necessary to delve too deeply into which of those numbers is, in fact, the "correct" one. Neither the debtor nor DFL have provided evidence–payment histories, for example, or testimony from someone at Chase who has knowledge of the loan history–to back up their numbers.

The trustee pointed out a one of the hearings, however, that the debtor derived the value he listed on amended Schedule D from an attachment to a proof of claim that Chase filed on March 4, 2009, one month after the petition date. That attachment itemized the alleged mortgage arrearage (presumably pre-petition, as it specifically mentions January and February, and the debtor filed his petition February 4), principal balance, interest (again, calculated from December 2008, which was pre-petition), and late fees, and comes up with a category entitled "TOTAL INDEBTEDNESS CLAIM AMOUNT" of $291,245.60, which is the amount the debtor listed on the amended Schedule D.[2] In contrast, the $311,953.90 value DFL urges the Court to use comes from the body of a pleading–the motion for relief from stay Chase filed May 20, 2009.

Further, the debtor's valuation appears in his schedules, which are accompanied by a declaration, signed by the debtor under oath, attesting that they are true and accurate to the best of his belief. At least one court has

---

[2] Chase later withdrew its claim, but since the hearings on the motion to dismiss, has reinstated it, indicating that it withdrew the claim in error.

opined that this fact turns the debtor's statements into admissions under Fed. R. Evid. 801(d)(2), and makes them "directly admissible."  *See* In re Arcella - Coffman, 318 B.R. 463, 475 (Bankr. N.D. Ind. 2004)[3].  Whether that is true or not, there is no question that the debtor submitted his schedules, and the information in them, to the Court under oath.  DFL's valuation, in contrast, does not come from sworn documents, but from a pleading filed on behalf of the creditor.

Another factor weighing against using the value listed in Chase's motion for relief is that the relevant time period for determining whether a debtor exceeds the § 109(e) debt limit is, according to the words of the statute itself, "the date of the filing of the petition."  Section 109(e) states that only an individual with regular income who owes, "on the date of the filing of the petition," less than the prescribed amounts of noncontingent, liquidated debts, is eligible to be a Chapter 13 debtor.  *See also*, In re Arcella-Coffman, 318 B.R. at 473.  The Court does not know the value of the Chase debt as of  the date of

---

[3]  This Court respectfully disagrees–pursuant to Rule 801(d)(2), a party's statement is an "admission" if it is offered against the party by his/her opponent.  The characteristic that makes a party's statement an "admission" is the fact that the party's opponent offers the statement against the party, not the fact that the party made the statement under oath.  Indeed, Rule 801(d)(2) does not require a statement to be made under oath in order for it to constitute an admission.  Further, the significance of a statement qualifying as an "admission" under Rule 801(d)(2) is that it is not hearsay, and therefore is not rendered inadmissible by Rule 802 unless it falls under an applicable hearsay exception.  This doesn't necessarily make the statement "admissible"–the statement still may not be relevant, or may not be made by a party with knowledge, etc.  It simply takes it out of the category of hearsay.

the petition–February 4, 2009. The debtor did not file his schedules with his petition, and Chase had not filed a proof of claim as of that date. The debtor filed his original schedules on February 19, 2009–two weeks after he filed his petition. On that date, his sworn Schedule D showed the value of Chase's debt as $285,000. Chase then filed its claim approximately two weeks later, on March 4, and the debtor based his amended schedules on that claim. Accordingly, the value that Chase gave on its proof of claim, which the debtor used in his schedules, is the value provided in closest temporal proximity to the date the debtor filed the petition.

In contrast, Chase filed the motion for relief three and a half months *after* the debtor filed his petition. The value that counsel for Chase listed in that motion includes in the total amount Chase claims it is owed a *post-petition* arrearage of $6,203.69 (inclusive of attorney's fees), which accounts for some of the $20,708.30 difference in the two amounts. It is not clear what accounts for the remaining $14,500 difference. Thus, the value DFL listed from the motion for relief from stay represents, at least in part, post-petition debt, which the Court should not include when it is calculating secured debt "on the date of the filing of the petition."

So–if it were to matter, the Court would be inclined to accept the debtor's valuation of the Chase debt over the valuation proposed by DFL. But it does not matter–the debtor does not exceed the secured debt limit either way.

Similarly, the debtor remains below the secured debt limit regardless of

10

whether the Court accepts the debtor's valuation of DFL's debt, or DFL's own valuation. As discussed above, Chase holds the first mortgage on the debtor's residence, and the debtor owes Chase at least $291,245.60. Summit Credit Union holds the second mortgage, and the debtor owes Summit $121,547.02. In combination, then, the debtor owes the two senior mortgage creditors in excess of $412,000. That debt is secured by the debtor's residence, which the debtor values on his Schedule A at $365,000. The value of the collateral that secures the two senior mortgages is less than the total amount of the debt on those two mortgages, so a portion of Summit's claim is unsecured. This means that DFL's *third* mortgage is wholly unsecured. Given that fact, the amount of the DFL debt does not have any impact on whether the debtor exceeds the *secured* debt limit.

Finally, the Court discussed above the fact that the numbers the debtor chooses to use on his schedules are not determinative in the debt limit discussion. Case law also provides, however, that the creditor's numbers are not determinative either. The <u>McGovern</u> court made this point, stating that

> In the same fashion, the court is not bound by the claims as creditors have chosen to assert them. Just as the debtor is not permitted to control its eligibility for relief under Chapter 13, that right should not be restricted by the demands of creditors. Instead, in each instance, the court is required to look beyond the information given and make an independent determination.

<u>In re McGovern</u>, 122 B.R. at 714, citing <u>In re Sylvester</u>, 19 B.R. 671, 673 (9th Cir. BAP 1982).

Case 09-21220-pp    Doc 78    Filed 08/14/09    Page 11 of 32

The Court has made that independent determination, and has determined that (1) the debtor's secured debt values and classifications are more appropriate to use for the secured debt limit calculation than are DFL's, (2) using the debtor's numbers results in the debtor falling well below the secured debt limit, and (3) even if the Court were to accept DFL's assertions regarding how much the debtor owes Chase on the first mortgage and how much he owes DFL on the third mortgage, the debtor still would not exceed the secured debt limit. Accordingly, the Court next must determine whether the debtor exceeds the unsecured debt limit.

B. *While the Court concludes that creditor DFL's debt is "liquidated," the Court requires further evidence to determine whether the debtor exceeds the unsecured debt limit under § 109(e).*

On the amended Schedule F, the debtor reflected the total unsecured, non-priority debt he owed at $53,785.47. When one adds this amount to the $268,881.25 of unsecured debt held by the secured creditors that the debtor listed on the amended Schedule D, one gets a total of $322,666.72, which does not exceed the § 109(e) unsecured debt limit. Again, however, DFL urges the Court to look beyond these numbers, and argues that as the result of such an exploration, the Court will discover that the debtor exceeds the unsecured debt limit. The debtor responds that his debt to DFL is "unliquidated," and thus should not even be included in the debt limit calculation.

1. The total amount of unsecured debts upon which the parties do not disagree falls well below the unsecured debt limit.

12

The amended Schedule F that the debtor filed on July 7, 2009 lists the following unsecured creditors:

| | |
|---|---|
| Attorney Randall Leece | $554.88 |
| Barklays | $14,392.91 |
| Citifinancial | $6,000 |
| Culligan | $2,800 |
| DeWitt, Ross | $6,455.57 |
| IRS | $13,510.13 |
| KCW | $775.00 |
| MHS Physicians | $4,507.60 |
| PRA Receivables Mg. | $1,611.49 |
| Wells Fargo Financial | $395.27 |
| Wis. Dept. Rev. | $2,725.92 |
| WP&L | $56.70 |

Not all of these unsecured creditors filed proofs of claim.[4]  For the ones who did, the amounts they listed on their proofs of claim match the amounts the debtor showed on his amended Schedule F.[5]

If one adds up the total of these unsecured claims–the amounts of which DFL does not dispute–one comes up with $53,785.47.  That total is, of course, far less than the $336,900 limit prescribed by § 109(e).  But as the § 506 bifurcation analysis of the secured debt shows, the debtor has further unsecured debt which the Court must add to the calculation.

An individual named James Van Horn holds a fourth mortgage on the

_____

[4]  The claims bar date has passed.

[5]  There is one negligible exception.  The Wisconsin Department of Revenue's proof of claim lists the value of its claim as $2,726.53–a whopping sixty-one-cent difference increase over the amount the debtor listed on Schedule F.

13

debtor's house, in the amount of $25,000. As with DFL's mortgage debt, creditor Van Horn's mortgage debt is wholly unsecured. Creditor Van Horn also holds a $75,000 mortgage on a second piece of real property the debtor owns. The debtor classifies $1,000 of this debt as unsecured, and DFL doesn't dispute this. So those two claims add another $26,000 in unsecured debt to the $53,785.47 from Schedule F, bringing the unsecured debt total to $79,785.47.

There are two further sources of unsecured debt unaccounted-for by the above calculations. The first source is DFL's unsecured debt on the third mortgage.

> 2.   In the disagreement between the parties as to the nature of DFL's debt, the Court concludes that DFL's debt is "liquidated."

DFL's debt on the third mortgage raises the critical legal issue involved in this debt calculation. While the parties disagree regarding the amount of that debt, their bigger disagreement relates to whether the Court should include DFL's debt in the debt calculation at all. Section 109(e) states that a Chapter 13 debtor is limited to $366,000 of "noncontingent, *liquidated*, unsecured debts." If a debt is not "liquidated," it does not count for purposes of the debt limit calculation.[6]

---

[6] The debtor argued in his pleadings and at the hearings that some of his unsecured debts were "contingent." The Court rejected these arguments for the reasons stated on the record at those hearings.

14

The debtor argues regardless of the amount of the debt he owes to DFL, that debt is not "liquidated," and therefore should not be included in the debt limit calculus. If the debtor is right, he survives the motion to dismiss. DFL responds that its debt *is* "liquidated," and therefore should be included in the debt calculus. If DFL is right, then the amount of its debt, as well as the amount of the unsecured portion of the Chase and Summit debts, become the critical factors in determining whether the debtor's unsecured debt exceeds the limit.

    a.    *The commonly-used definitions of the term "liquidated"*
             *relate to how one calculates the amount of the debt.*

Section 109(e) does not define the term "liquidated." Case law does provide various definitions of that term–but the definitions aren't particularly helpful in a situation like this one. The basic, no-frills definition of a "liquidated" debt usually looks like the one enunciated by the bankruptcy court for the Northern District of Indiana in In re Williams, 51 B.R. 249, 250 (Bankr. N.D. Ind. 1984): "A claim is liquidated when the amount due is capable of ascertainment by reference to an agreement or by computation." Another court worded it this way: "[W]hether a debt is liquidated turns on whether it is subject to 'ready determination and precision in computation of the amount due.'" In re Fostvedt, 823 F.2d 305, 306 (9th Cir. 1987), citing In re Sylvester, 19 B.R. 671, 673 (9th Cir. BAP 1982). Yet another court said that a debt is "liquidated" if "the amount due can be readily ascertained either by reference to

15

an agreement or through simple mathematics." <u>In re McGovern</u>, 122 B.R. at 715 (citations omitted).

These various definitions focus on the *amount* of the debt, and how one calculates it. Fifty years ago, the court in <u>In re Silver</u> stated that, "although it may appear that some is due, if it does not also appear how much is due, the debt is not liquidated." <u>In re Silver</u>, 109 F. Supp. 200, 203-204 (E.D. Ill. 1952), *aff'd*, 204 F.2d 259 (7th Cir. 1953). In <u>McGovern</u>, the Indiana bankruptcy court stated, "Liquidation relates only to the amount of any liability. It does not concern the existence of liability itself. It focuses upon the certainty of the amount claimed due or the precision with which it can be determined." <u>In re McGovern</u>, 122 B.R. at 714.

If liquidation relates only to the ability to ascertain the *amount* of money that a debtor owes, then an example of an *unliquidated* claim is an un-adjudicated tort claim. A debtor files his petition, and lists among his debts a possible claim someone has against him for injuries sustained in a car accident. The tort case has not yet been adjudicated in state court–the debtor may very well owe this person money, but how much will depend on a multitude of factors and not susceptible to precise, predictable calculation. As the <u>McGovern</u> court explained, "Particularly where claims for injuries to persons and property are concerned, the value of the claim is uncertain because the damages cannot be determined with any precision. Judgment and discretion are needed to determine the amount of any loss." <u>In re McGovern</u>,

16

122 B.R. at 716.

In view of this definition of a "liquidated" debt–that it is nothing more than a debt whose amount can be determined by application of a mathematical formula–DFL argues that its debt is completely liquidated.  It argues that there exists an agreement between the parties, and that that agreement specifies the amount of the debt the debtor owes DFL.   DFL urges the Court to take the original amount the debtor agreed to pay DFL, subtract out what the debtor has paid to date, and calculate the interest on the remaining balance.  This provides the amount of the debt, says DFL–voila, a liquidated debt.

> b.   *The debtor argues that one cannot calculate the amount of DFL's debt, because it is disputed.*

The debtor responds that problem with DFL's argument is that because of the nature of the agreement between the parties, it is not clear that the debtor owes DFL a debt, and if he does, it is not clear how much that debt is, or ought to be.  In May 2004, the debtor purchased from DFL's predecessor company its business assets (assets of a marble and granite sales and service concern.)  As part of this transaction, the debtor and DFL's predecessor signed a contract entitled "Asset Purchase Agreement."  The agreement listed the purchase price as $600,000.  The debtor was to pay this price through a $12,500 non-refundable deposit on or before the date the parties signed the agreement, a cash or wire transfer of another $312,500 at closing, and a promissory note for $275,000.  The agreement laid out particular terms for the

17

promissory note:

> The Promissory Note shall be for a period of thirty (31) months, bearing interest at six (6) percent per annum, with monthly payments of interest and principal in accordance with the schedule of payments provided in the Promissory Note for thirty (30) months and one (1) final payment of the outstanding principal and interest. In the event of default, as further described in the Promissory Note, and after maturity, whether by acceleration, the passage of time or otherwise, the outstanding principal balance and accrued interest shall bear interest at the annual rate of twelve (12) percent, per annum ("Default Rate").

The purchase agreement runs on for 26 pages, and contains numerous provisions. It provided for the debtor to give certain credits to the seller at closing, and likewise for the seller to give the debtor certain credits. It provided that in addition to the promissory note, the debtor was to give the seller a mortgage on his personal residence, as well as a personal guaranty. The agreement provided for certain "prorations" as of the closing date–rent, taxes, utilities, etc. It provided that the principal of the seller would enter into a consulting agreement with the debtor at closing, whereby the principal would work with the debtor for twenty-six weeks in exchange for $800 a week and a 6% commission on gross sales on outstanding bids for two, specified, on-going projects. It contained a non-compete clause.

In December 2007, DFL filed suit against the debtor in Walworth County Circuit Court, seeking to recover amounts it claimed the debtor owed under the agreement and the promissory note. The debtor filed an answer and counterclaims. Litigation proceeded in state court until early 2009, when the

18

debtor's business, Stone Specialty, LLC, filed for Chapter 11 protection. (Shortly thereafter, the debtor filed his individual Chapter 13 petition in this case.)

In other words, the parties dispute whether the debtor owes DFL a debt any longer, and if so, how much. DFL acknowledges that its claim is disputed (although it points out that the debtor has not filed an objection to its claim in bankruptcy court), but responds that the fact that a debt is disputed does not exclude it from the Chapter 13 debt calculation. There is case law to support this argument.

    c.    *Case law holds that the fact that a debtor "disputes" a debt does not render that debt "unliquidated" for § 109(e) purposes.*

In <u>Williams</u>, *supra*, the court stated that "a claim should not be excluded from the § 109(e) calculation merely because it is disputed." <u>In re Williams</u>, 51 B.R. at 251, citing <u>In re Sylvester</u>, 19 B.R. at 674. *See also*, <u>In re Albano</u>, 55 B.R. 363, 368 (N.D. Ill. 1985) ("Merely because a debtor disputes a debt, or has defenses or counterclaims, that does not render that debt . . . unliquidated"); <u>In re Ristic</u>, 142 B.R. 856, 861 (Bankr. E.D. Wis. 1992); <u>In re Knight</u>, 55 F.3d 231, 234 (7th Cir. 1995) ("we conclude that a disputed claim is a debt to be included when calculating the § 109(e) requirements").

The <u>McGovern</u> court discussed this issue at length. The court, after discussing the sometimes subtle distinctions among "contingent," "disputed," and "liquidated" debt, reached the following conclusion:

19

Disputes concerning a claim can involve a challenge to the existence of liability and/or its amount. Nonetheless, a disputed debt is not that same as a contingent or unliquidated one. *See Matter of Covey*, 650 F.2d 877, 881 n.6 (7th Cir. 1981). "Merely because a debtor disputes a debt, or has defenses or counterclaims, that does not render that debt contingent or unliquidated." *In re Albano*, *supra*, 55 B.R. at 368. A disputed debt is simply that and nothing more–disputed. Disputes concerning a claim do not change the characterization it would otherwise have as noncontingent or liquidated. *In re Pulliam,* [90 B.R. 241] at 244-246 [Bankr. N.D. Tex. 1988).

Disputed claims are considered in determining eligibility for relief under Chapter 13. *In re Pulliam, supra,* 90 B.R. at 244. So long as it is otherwise noncontingent and liquidated, "a claim should not be excluded from the § 109(e) computation merely because it is disputed." *In re Williams, supra,* 51 B.R. at 251. Quite simply, disputes, defenses, and counterclaims concerning a debt are not relevant tot he question of eligibility for relief under Chapter 13. *In re Sylvester, supra,,* 19 B.R. at 673.

In re McGovern, 122 B.R. at 717.

So–a number of the bankruptcy courts of the Seventh Circuit, and the Seventh Circuit itself, are of the view that the fact that a debtor disputes whether he owes a debt, or disputes the amount of that debt, is irrelevant to the debt limit analysis. One might ask, why should that be? If the debtor truly does not owe the debt, or does not owe as much as the creditor claims, why should he nonetheless lose his ability to seek Chapter 13 protection because of that debt?

The Seventh Circuit has indicated that one answer to that question lies in the statutory terms, and in the definitions Congress provided for those terms. In § 101(12) of the Code, Congress has defined the term "debt"–the term

20

used in § 109(e)–to mean "liability on a claim."  In § 101(5), Congress defines the term "claim" as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed . . . ."  (Emphasis added.)  In <u>In re Knight</u>, the Seventh Circuit looked at these definitions, and concluded that "the Code expressly recognizes that a disputed claim is nevertheless a claim."  <u>In re Knight</u>, 55 F.3d at 234.  This led the Court to further conclude that "[i]n light of the virtual synonymy of 'debt' and 'claim,' therefore, we conclude that a disputed claim is a debt to be included when calculating the § 109(e) requirements."  <u>Id.</u>  In other words, if on the petition date the creditors hold rights to payment–even disputed rights to payment–of amounts that exceed the debt limit, the debtor is not eligible for Chapter 13 protection.

The district court for the Northern District of Illinois posited a policy justification for this approach.  In <u>In re Albano</u>, the court conceded that, "[i]nevitably some claims presented to a Chapter 13 trustee will be disallowed if the debtor has a valid defense against them."  <u>In re Albano</u>, 55 B.R. at 368. But the <u>Albano</u> court reasoned that "it would tend to generate a circular (and self-defeating) barrier to administration of Chapter 13 proceedings if the bankruptcy court had to pass on the merits of all claims before the proceeding could even get under way."  <u>Id.</u> (citations omitted).  The court reasoned that ineligible debtors should not be able to "shoehorn" themselves into Chapter 13 simply by disputing debts, and that bankruptcy courts could not possibly be

expected to "look into each dispute to determine whether it is bona fide."  Id.

        d.      *Some kinds of disputes do render a debt "unliquidated," if the nature of the dispute is such that one cannot determine whether a debt even exists.*

One bankruptcy court within the Seventh Circuit's ambit, however, has expressed discomfort, and disagreement, with the conclusion that the fact that a debtor disputes liability on or the amount of a debt is irrelevant to the debt limit calculation.  In Arcella-Coffman, 318 B.R. 463 (Bankr. N.D. Ind. 2004), the bankruptcy court for the Northern District of Indiana, Hammond Division, looked carefully at the assertion that the fact that a debtor disputes a debt does not render it unliquidated, and concluded that the matter was not that

simple.  The court stated,

> And what of the concept of a "disputed" claim/debt?  Nearly
> every court confronting this issue has held that a "dispute" by the
> debtor with respect to a "claim" does not cause the "debt" to be
> "unliquidated." . . . [T]hat is how the cases actually analyze the
> issue: a "debt" is assumed if an obligation/liability is listed in a set
> of schedules, and checking the "disputed" column may cause the
> debt to be deemed liquidated even if liability is strongly and
> legitimately contested.  The Court is of the opinion that what is
> meant to be conveyed by the cases that state that a dispute as tot
> he debt does not *ipso facto* cause the debt to be unliquidated, is
> that the debtor's mere refusal to admit liability for, and the amount
> of, a claim will not negate a finding that a debt exists in an amount
> capable of easy mathematical computation.  It is the good faith of
> the dispute, particularly with respect to the underlying issues of
> the debtor's liability–and not the statement that there is a
> dispute–that is relevant for the purposes of § 109(e).

In re Arcella-Coffman, 318 B.R. at 471.

The Arcella-Coffman court, understanding that it was bound by the

Seventh Circuit's decision in In re Knight, carefully parsed the language of that

decision, and found in the results of that parsing  support for its conclusion.

The court stated,

> The principal test stated in the [Knight] decision is drawn from *In
> re Fostvedt*, 823 F.2d 305, 260 (9th Cir. 1987): "[T]he question
> whether a debt is liquidated turns on whether it is subject to 'ready
> determination **and** precision in computation of the amount due.'"
> (citations omitted) [emphasis supplied].  Properly understood, this
> test has two components: *ready determination*, which focuses on
> the debtor's liability on a claim, **and** *precision in computation of the
> amount due*, which focuses on the monetary award to the creditor
> when a debtor is found to be liable.  Were this not the case, every
> inchoate potential tort liability of a debtor with respect to a motor
> vehicle accident which occurred prior to the filing of the
> bankruptcy petition would be "liquidated" with respect to lost
> wages and medical expenses of the "victim" asserting the claim,
> even though the debtor's negligence had yet to be determined.  The

23

same claim can be said for any number of complicated civil liability issues–so long as the amount of damages can be easily calculated from simple evidence, the debt would be deemed to be "liquidated" to that extent. This cannot be what the concept of "liquidated" means, as the Ninth Circuit BAP, affirmed by the Ninth Circuit Court of Appeals–the source of the *Knight* test–stated in *In re Wenberg*, 94 B.R. 631, 634-635 (9th Cir. BAP 1988); *aff'd* 902 F.2d 768 (9th Cir 1990) . . . .

Id. at 471-472 (all emphasis from the original).

The Arcella-Coffman court concluded by pointing to the case of In re Hatzenbuehler, 282 B.R. 828, 831-32 (Bankr. N.D. Tex. 2002), in which the Texas court found that any interpretation of the term "liquidated" that would "require the Court to engage in a lengthy fact-finding process would add dramatically to the cost of chapter 13, inject an unwarranted element of uncertainty into the section 109(e) analysis and hamper the rehabilitative goals of chapter 13."

The Hatzenbuehler court–without any gnashing of teeth or extensive analysis–opined that a debt should be included for purposes of 109(e) if "on its face, it is a legally enforceable debt on the petition date." Id. at 832. The court gave the following example: "[i]f . . . the putative debtor was indebted on a note or other instrument, and the only dispute of that debt was a contested, fact-dependent defense to liability on the instrument, this rule would favor inclusion of the indebtedness in the section 109(e) analysis." Id. On the other hand, the court opined that if the nature of the dispute was such that the creditor had to prove the debtor's liability, that debt should not be included.

24

For an example of that kind of "unliquidated" debt, the court said, "if the payee under an instrument alleges that, under an alter ego theory, the debtor (rather than the named obligor) is the party actually obligated on the instrument, the debt should not be considered for the purposes of determining eligibility for chapter 13." Id.

Thus, the Arcella-Coffman and Hatzenbuehler courts perceive two kinds of "unliquidated" debt. The first kind of "unliquidated" debt appears in cases in which one cannot determine, at the time of the petition, whether the debt even exists, whether the putative creditor ever had any right to a payment. This is the debt that is not subject to "ready determination, as Knight and Fostvedt put it. If, as of the petition date, there is a question as to whether this particular debtor ever did in the past, or ever will in the future, be liable to this particular creditor under the applicable facts, then the debt is not subject to "ready determination," and therefore is not "liquidated." This is the example of the inchoate tort claim. The debtor was involved in a car accident. Someone else was injured in that car accident, and has threatened to or actually has filed a claim against the debtor. All that exists on the petition date is an accusation–there is no proof that the debtor owes, or ever will owe, this person any money. Under the Arcella-Coffman and Hatzenbuehler definitions, this claim is "unliquidated," because it cannot be readily determined whether the debt existed before the petition date, exists as of the petition date, or ever will exist in the future.

The second kind of "unliquidated" debt appears in cases where, even though it is clear that a debt exists–that a creditor holds a right to payment–at the time of the petition, the method for determining the amount of the debt requires more than a mathematical calculation. This kind of "unliquidated" debt is not subject to "precision in computation of the amount due," as Knight and Fostvedt put it. This is the corollary to the basic, no-frills definition of "liquidated" to which the Court referred earlier. This is the case in which a jury has found that the debtor caused the victim's injuries in the car crash, but as of the petition date, there is no way to determine how much the debtor will owe without assigning monetary values to pain and suffering, emotional distress, punitive damages and other variables that require one to use methods beyond simple mathematical calculations.

The Arcella-Coffman/Hatzenbuehler, two-part definition of "unliquidated" makes sense to this Court. It does not exclude from Chapter 13 protection that debtor who, by virtue of a mere allegation of liability that may never yield any obligation at all, must identify an inchoate debt on his schedules. At the same time, it does not allow a debtor who at one time was legally obligated on a debt to skirt the debt limits simply by classifying the debt as "disputed."

26

e.     *Even considering that some kinds of disputes render a debt "unliquidated," the debtor in this case does not have that kind of dispute, and his debt to DFL is "liquidated" for § 109(e) purposes.*

Applying this test to the facts at hand, the Court must conclude that the debtor's debt to DFL, while disputed, is nonetheless liquidated. First, the existence of the debt can be "readily determined." Prior to filing his petition, the debtor obligated himself under a promissory note to pay certain sums to DFL. He did not pay those sums. He argues that he was justified in not paying those sums due to various breaches in the original agreement. He may end up being proven right. But this is not a case in which the debt is not "readily determined. It is not a case in which one cannot determine, as of the petition date, whether this particular debtor ever did in the past, or will in the future, owe a debt to this particular creditor, or whether this particular creditor ever did have a right to payment. Some court in the future may find that, as a result of breaches of contract, the debtor does not have to pay the remainder of the debt he owes. But there is no question as to whether he ever owed a debt–only whether alleged breaches of the contract mean that he doesn't have to pay it.

Second, the amount of the debt can be "precisely computed." The debtor signed a promissory note agreeing to pay DFL $275,000. The debtor made some payments against that amount. Then he stopped making payments. While he argues that he was justified in ceasing to make those payments,

again, that does not impact whether or not one can precisely compute, using relatively simple math, how much of the $275,000 remains unpaid. Some future court may determine that the debtor does not have to pay that amount, but that does not mean that the amount cannot be calculated.

So–the Court finds that DFL's debt is liquidated, and therefore should be included in calculating whether the debtor exceeds the unsecured debt limit under § 109(e).

3.    The Court needs further evidence in order to be able to determine the amount of DFL's noncontingent, liquidated, unsecured debt.

Next, the Court must figure out the amount of DFL's debt. The debtor valued the debt on his schedules at $195,088.63. At the hearings on the motion to dismiss, counsel for the debtor indicated that she had taken this amount from the pleadings DFL filed in state court. While pointing out that the debtor strongly disagreed that he owed DFL that amount, counsel stated that this was the only number she had available to her to try to specify a debt amount for the purposes of truthfully completing the debtor's schedules.

DFL filed a proof of claim on March 9, 2009–a month after the debtor filed his petition. That proof of claim valued DFL's debt at $223,446.64, and classifies the entire amount as secured. The amount listed on DFL's proof of claim exceeds the amount the debtor listed in the schedules by $28,358.01. DFL did not file any attachments to its proof of claim which would show how it calculated that amount. If the debtor's $195,088.63 number came from the

28

state court complaint, filed a number of years ago now, presumably the difference in the two numbers is attributable to interest DFL claims has accrued between the date DFL filed the state court complaint and the date it filed its proof of claim in the bankruptcy case.

Again, the relevant date for calculating § 109(e) debt limits is the date of the petition. Thus, in order to determine the amount of DFL's debt for that purpose, one must conduct a mathematical calculation. One must begin with the original amount due under the promissory note: $275,000. One then must subtract the amount the debtor paid on that note–a number the Court does not know. Next, one must take the remaining, unpaid balance and calculate the applicable interest–under the terms of the note, 6% per annum–up until the petition date. The resulting figure is the amount of the debt for purposes of § 109(e). The Court does not have before it sufficient evidence to allow it to determine that figure.

The Court has scheduled an evidentiary hearing for August 26, 2009 at 1:30 p.m. Counsel for the debtor argued at the hearings on the motion to dismiss that it would be difficult, if not impossible, to present evidence at such a hearing to prove the amount of DFL's debt. But that argument assumes that the debtor will be presenting evidence on whether he owed the debt. He will not be. The Court expects that with relation to the amount of DFL's debt, the parties will present evidence on one issue and one issue only–how many payments the debtor made against the $275,000 before he stopped paying.

29

That number ought to be relatively simple to ascertain–the debtor may have canceled checks or bank statements, DFL may have a payment log. Whatever the evidence, the Court expects that it will relate solely to how many payments of how much each the debtor made on the promissory note before he stopped paying. That will allow the parties and the Court to "precisely calculate" the amount of the debt for § 109(e) purposes.

        4.    The Court also requires further evidence with regard to the dispute over how much of the debt held by secured creditors Chase and Summit Credit Union is unsecured.

This leaves discussion on the second source of unsecured debt to which the Court referred a lifetime ago–the proportion of the debt held by senior secured mortgage creditors (Chase and Summit Credit Union) that is unsecured. As to this source of unsecured debt, the dispute between the parties relates to the value of the collateral that secures those debts (the debtor's residence). The debtor has provided three different valuations on his residence. The amended Schedule A values the house at $365,000. An appraisal report the debtor obtained on May 8, 2009 values the house at $270,000. An appraisal report he obtained on May 23, 2009 values the house at $360,000. There is a possible fourth value, suggested by DFL's argument regarding the value of the Chase claim, and that is the assessed value for tax purposes recited in Chase's motion for relief from stay–$274,879. Depending on which of these values one uses, anywhere from $47,792.62 to $142,792.62 of the Chase/Summit debt is unsecured.

30

As discussed above, the two values the Court has for the DFL claim differ by $28,300. The values the Court has for the debtor's home differ by some $95,000. If one uses the numbers that most favor the debtor in both instances–the lower value on the DFL debt and the higher value on the debtor's house–the debtor falls below the § 109(e) secured debt limit by some $68,000. If one uses the numbers that most favor DFL–the value of its debt that DFL lists on the proof of claim, and the lowest appraised value on the debtor's house–the debtor exceeds the debt limit by approximately $55,000.

Accordingly, the value of the debtor's house as of the petition date is critical in determining whether the debtor exceeds the debt limits. The Court had scheduled the August 26, 2009 evidentiary hearing in order to allow the parties to present evidence with regard to the value of the house as of the petition date.[7]

III.   CONCLUSION

For the reasons discussed above, the Court **OVERRULES** that portion of the debtor's objection to DFL's motion to dismiss which asserts that his debt to

---

[7] The Court notes that the debtor scheduled one of the claims of Peoples Bank–the one in the amount of $24,618.45, secured by three vehicles–as wholly secured. The debtor later argued in pleadings on the motion to dismiss that only $12,288.84 of that claim is secured, and that $12,329.61 is unsecured. Given how close the debtor is to the unsecured debt limits, the question of how much of the Peoples Bank claim is secured may be relevant to answering the question of whether the debtor exceeds the debt limits, and accordingly, the debtor may wish to present evidence on that topic on August 26.

31

DFL is unliquidated. With regard to the portions of the debtor's objection that are based on the amount of DFL's debt and the amount of the unsecured portions of the Chase and Summit Credit Union claims, the Court will hear evidence on those issues on **August 26, 2009** at **1:30 p.m.** in Room 149.

# # # # #

Case 09-21220-pp    Doc 78    Filed 08/14/09    Page 32 of 32